ORDERED.

**Dated:  May 06, 2016**

K. Rodney May
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re

UNIVERSAL HEALTH CARE                    Case No. 8:12-bk-1520-KRM
GROUP, INC.,                             Chapter 11

                                         Jointly Administered with
AMERICAN MANAGED CARE, LLC,              Case No. 8:13-bk-5952-KRM


        Debtors.
_____/

SONEET R. KAPILA, as Chapter 11 Trustee
of Universal Health Care Group, Inc.,

        Plaintiff,

vs.                                      Adv. No. 8:15-ap-132-KRM

WARBURG PINCUS, LLC;
WARBURG PINCUS PRIVATE
EQUITY FUND IX, L.P.;
ALLEN WISE; and ALOK SANGHVI,

        Defendants.
_____/

**MEMORANDUM OPINION AND
<u>ORDER ON DEFENDANTS' MOTIONS TO DISMISS</u>**

The debtor, Universal Health Care Group ("Universal"), was a holding company whose

subsidiaries offered regulated Medicare HMO plans in Florida, Texas and Nevada.  In February

of 2013, the State of Florida commenced insolvency proceedings against the two Florida subsidiaries for lack of capital.  Universal filed for Chapter 11 relief on February 6, 2013, before the UCC sale of the subsidiaries' stock by the group of senior secured creditors, led by BankUnited.  Universal attempted a § 363 sale of the subsidiaries, but that effort failed.  The Court then directed the appointment of a trustee.

The Chapter 11 trustee, Soneet Kapila (the "Trustee"), filed this adversary proceeding alleging that Universal's collapse is the result of its borrowing $37.5 million in 2011 to redeem preferred stock at a price of $33 million.  The Trustee seeks to avoid the redemption payments and recover damages from the defendants, each of whom have filed motions to dismiss.[1]

## FACTUAL BACKGROUND

The Court takes the allegations in the complaint as true, and summarizes the pertinent allegations below.[2]

Universal was a Delaware corporation headquartered in St. Petersburg, Florida (¶ 12).[3] It was formed by a merger in 2006.  It offered health insurance and managed care products through wholly-owned, regulated  subsidiaries (¶ 12).

One of the Florida subsidiaries, Universal Health Care, Inc. ("UHC"), had contracts with the Department of Health and Human Services and the Center for Medicare and Medicaid Services ("CMS"), to provide health care services to Medicare enrollees in Florida (¶ 12).  The other Florida subsidiary, Universal Health Care Insurance Company ("UHCIC"), had contracts with CMS  to  provide  Medicare services to enrollees in twenty-three states and the District of

---

[1]  Doc. Nos. 8, 9 and 10.  Plaintiff filed memoranda in opposition (Doc. Nos. 23, 24 and 25).

[2]  *Ashcroft v. Iqbal*, 556 U.S. 662, 667-78 (2009).

[3]  All citations to paragraph numbers refer to the Trustee's Complaint, which is Doc. No. 1 in this proceeding and attached exhibits.

Columbia (¶ 12).  Universal also had regulated Medicare HMO subsidiaries in Texas and Nevada (¶ 12).  A fifth subsidiary, debtor American Managed Care, LLC ("AMC"), operated as a third-party administrator for the regulated subsidiaries (¶ 12).

Akshay M. Desai, M.D. ("Dr. Desai"), was Universal's CEO and Chairman (¶ 13).  Universal's largest shareholders were Dr. Desai and the Desai Limited Partnership, an entity controlled by Dr. Desai and his wife (¶ 13).  Dr. Desai was the indirect majority shareholder through his control of the Desai Limited Partnership (¶ 29).  He also led Universal's management team (¶ 29).

On May 26, 2006, Universal entered into Stock Purchase Agreements with defendants Allen Wise ("Wise") and Warburg Pincus Private Equity IX, LP ("Equity IX"), a private fund organized and managed by defendant Warburg Pincus, LLC ("Warburg") (¶¶ 4 and 18).[4]  Equity IX and Wise agreed to purchase 11,143,871 and 384,271 shares, respectively, of Universal's Series A Convertible Preferred Stock (the "Preferred Stock") (¶¶ 21 and 22).

In anticipation of the stock purchase, Equity IX loaned Universal $6.2 million (¶ 19).  On August 18, 2006, Equity IX cancelled the $6.2 million note and invested another $22,660,471, bringing its total investment in Universal to $28,860,471 (¶¶ 19 and 21).  In return, it received 11,143,871 shares of the Preferred Stock (¶ 21).  The invested funds were earmarked as working capital (¶ 21).  Contemporaneously, Wise invested $1,000,000, in return for 384,271 shares of the Preferred Stock (¶ 22).

Universal filed an Amended and Restated Certificate of Incorporation ("COI") in Delaware on August 17, 2006 (¶ 20).  The COI provided the holders of the Preferred Stock with

---

[4]  Defendant Wise had worked in the health care industry for many years; formerly he had been the chief executive officer of Coventry Health Care, Inc.  Doc. No. 1 at ¶ 17.  In 2006, he agreed to co-invest in Universal with Warburg *Id.*  Warburg is an internationally known private equity firm.  *Id.* at ¶ 36.  Defendant's motion to dismiss advises that its correct name is Warburg Pincus Private Equity IX, L.P., not Warburg Pincus Private Equity Fund IX, L.P. as stated in the Complaint.  Doc. No. 9 at 1.

a right of redemption, exercisable after five years (i.e., in August of 2011) at a formula price (Ex. B § 10 (a)).

Equity IX and Wise, as holders of the Preferred Stock, had:  (a) a first claim to Universal's equity value; (b) the right to receive quarterly dividends (in the form of additional shares of Preferred Stock or cash); and (c) the right to compel Universal to repurchase the Preferred Stock on or after August 17, 2011 (¶ 26).  If Equity IX and Wise had elected to redeem their shares in August 2011, the combined price required by the COI would have been approximately $60 million (¶ 28).[5]

The Stock Purchase Agreement also required placement of at least one of Warburg's investment professionals on Universal's board of directors, in keeping with Warburg's general policy for its private equity funds (¶ 24).  This allowed Warburg to monitor its investments for the benefit of its investors (¶ 24).

Defendant Alok Sanghvi ("Sanghvi") became Warburg's representative on Universal's Board in 2008 (¶ 23).  Sanghvi was an employee of Warburg, having the status of "principal" (¶¶ 6 and 23).  He remained on Universal's board until February 15, 2011 (¶¶ 6 and 69).  Warburg maintained control over decisions and actions of Sanghvi with respect to Equity IX and Universal (¶ 6).

Equity IX and Wise did not own a majority stake in Universal; nor did they control its operations (¶ 29).  But, the Stock Purchase Agreement gave Warburg and Equity IX veto power over certain matters, including (a) selling, leasing, or disposing of assets in excess of $1.0

---

[5]  Doc. No. 1 at ¶ 20; Ex. B §10(a).  The "Liquidation Preference" of the Preferred Stock is defined in the COI as "the Stated Value per share [$2.60233] plus all Accrued and Unpaid Dividends equal to 12.0% per annum of the Stated Value, compounded annually thereon."  Doc. No. 1 at ¶¶ 27and 28; Ex. B §2(a) and 3(a).

4

million outside the ordinary course of business and (b) incurring indebtedness for borrowed

money in excess of $1.0 million in any fiscal year (¶ 25).

The business of the regulated subsidiaries was dependent on Medicare funding levels,

which were susceptible to fluctuations based on changes in reimbursement rates authorized by

CMS (¶ 14). Universal's financial condition was deteriorating between 2007 and 2011 (¶¶ 40

and 52-57):

a. UHC had experienced a deterioration in the level of medical claims payable in the last six months of 2006; the ratio of medical claims to premium income had risen and UHC had underpriced its products;

b. the medical loss ratio projected for UHCIC was 99%; medical losses were expected to almost equal premium income;

c. 1st Quarter 2007 earnings, before depreciation, interest, taxes, depreciation and amortization ("EBITDA"), was a negative $18.3 million;

d. by early 2007, Universal was in a "zone of insolvency;"

e. in 2007, the State of Florida Office of Insurance Regulation demanded evidence of an adequate capital structure, and forwarded a proposed order of liquidation; and

f. in 2007, the State of Florida Office of Insurance Regulation commenced litigation concerning capitalization and liquidation of UHCIC.

Universal's financial projections were erroneous, including inaccurate EBITDA, which

painted a healthier picture of Universal's financial condition than actually existed

(¶¶ 51, 52 and 62). Universal's projections of net income in 2008, 2009 and 2010 were also

erroneous (¶ 57). EBITDA fell during 2008 by $44,000,000, increased in 2009 by

$10,000,000, and fell again in 2010 by $4,500,000 (¶ 52). Net income followed a similar

trend; so did cash (¶ 53).

Universal's auditors, Ernst & Young, LLP ("E&Y"), published an audited consolidated financial report for Universal for the year 2007, showing cash of $245 million and net income of $43 million (¶ 38). E&Y's report did not reflect underlying risks and problems in Universal's business (¶ 39). The 2007 E&Y audit report expressly stated E&Y made no opinions in respect to internal controls (¶ 39).

Warburg prepared quarterly valuation reports on the companies in its private fund portfolios (¶ 42). Quarterly valuation reports were prepared by Warburg personnel and reviewed by Warburg management (¶ 42).

By mid-year 2008, Warburg had assessed the performance of Universal as highly unpredictable (¶ 41). By the end of 2008, Warburg's assessment of Universal's ability to raise capital was extremely low (¶ 41). Warburg's quarterly valuation reports informed it that Universal had performed more poorly than Warburg had anticipated (¶ 44). Warburg also discounted the financial information that Universal provided (¶ 44).

As of September 30, 2007, Warburg had assessed the value of Equity IX's Preferred Stock (initially, a $28.9 million investment) at $10 million (¶ 45). By the end of the first financial quarter in 2009, Warburg deemed Universal to have a total equity value of only $23.9 million; it further reduced the value of Equity IX's investment to $7 million (the "FQ 2009 Valuation") (¶ 46). Sanghvi was the primary person at Warburg who prepared the FQ 2009 Valuation (¶ 48).

Warburg later decreased its valuation of Equity IX's investment to $5 million (¶ 50). Warburg continued to value Equity IX's investment in Universal at $5 million through at least May 25, 2010 (¶ 50). Warburg's $5 million valuation tracks with the downward financial performance of Universal and its subsidiaries (¶ 51).

In 2011, Universal was worth less than the $60 million redemption price that would have been mandatory after August 17, 2011, as evidenced by the fact that Universal, Equity IX and Wise, agreed to the lesser price of $33.4 million, only six months prior to their right to demand $60 million (¶ 28).

Equity IX and Wise made overtures to Universal, through Sanghvi, to have Universal buy back the Preferred Stock before the August 2011 redemption date (¶ 58). Sanghvi was Warburg's sole representative in negotiating the terms of the buy-out (¶ 58). Sanghvi also handled the early redemption of Wise's Preferred Stock (¶ 58).

From October 2010 through mid-February 2011, Sanghvi wore two hats − one as a principal of Warburg, the other as a director of Universal − while he was communicating with Universal's representative, Sandip Patel, for the early redemption (¶¶ 58 and 60).

In December 2010, Universal's negotiator, Mr. Patel, advised Sanghvi that Universal had received a commitment from a lending group, led by Wells Fargo, for a $37.5 million loan (¶ 63). With the loan commitment in place, the negotiation between Patel and Sanghvi focused on how much of the new money Equity IX and Wise would receive for their Preferred Stock (¶ 63). Sanghvi attempted to get as much of the debt financing as possible for Equity IX and Wise (¶ 64). Initially, he demanded all of it; eventually they agreed on $33.4 million, but only after Patel insisted that Universal would have no cash if Equity IX and Wise took the entire amount of the loan (¶ 64).

Warburg and Sanghvi were in better positions to check the accuracy of Universal's financial projections (¶ 62). Sanghvi chose to not assess the accuracy of the projections (¶ 62). At no time during the negotiations did Sanghvi advise Patel, or anyone else at Universal, of Warburg's diminished valuation of Universal, including the FQ 2009 Valuation (¶ 65).

On February 7, 2011, Universal, Equity IX and Wise entered into a Stock Redemption Agreement (¶ 67). The transaction closed a week later, on February 14, 2011. Universal paid $32,286,667 to Equity IX and $1,113,333 to Wise, to redeem all of their shares of Preferred Stock (¶ 68).

Sanghvi, on the advice of Warburg's legal counsel, abstained from the Universal board's vote on this transaction (¶ 71), even though he had supported the Stock Redemption and the debt financing up to that point (¶ 71). He had encouraged Universal to make the redemption and approved the corporate minutes for the board's approval of the $37.5 million loan required for the redemption (¶ 71).[6]

On February 15, 2011, Sanghvi left Warburg for new employment (¶ 69). Shortly after his departure, Warburg paid Sanghvi a special bonus (¶ 69).

Equity IX and Wise had first claim in August 2011 to all of the equity value of Universal up to the $60 million mandatory redemption price (¶ 72). Instead of waiting for that, Equity IX and Wise agreed to the early stock redemption (¶ 72). The $32.3 million redemption paid to Equity IX represented a discount of approximately $28 million from what Equity IX would have been entitled to demand under the COI just six months later (¶ 28). Wise agreed to an identical discount (¶¶ 28, 68, 72). The Trustee alleges that by agreeing to the aggregate redemption price of $33.4 million, the parties demonstrated that Universal had no equity in excess of that amount (¶ 72).

The Stock Redemption eliminated any available equity in Universal and burdened the company with $37.5 million of senior secured debt (¶ 73). The 2011 redemption of the Preferred Stock is the cause of Universal's collapse (¶¶ 73-75).

---

[6] Universal expressly informed the lenders that the purpose of the loan, among other things, was "to redeem preferred shares held by Warburg Pincus." Doc. 1, Ex. C at 16.

Universal was either insolvent prior to the Stock Redemption or it became insolvent by pledging all of its assets to borrow $37,500,000, a sum in excess of the negotiated equity marker of $33,400,000 and of the FQ 2009 Valuation of $23.9 million (¶¶ 74 and 75).[7]

## ANALYSIS

I.   Motion to Dismiss Standard

Under Rule 12(b), a complaint may be dismissed for failure to state a claim upon which relief can be granted.[8]  "When considering a motion to dismiss, all facts set forth in the . . . complaint are to be accepted as true and the court limits its consideration to the pleadings and exhibits attached thereto."[9]  In *Ashcroft v. Iqbal*,[10] the Supreme Court explained that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[11]  The Court further explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to

---

[7]  The Wells Fargo loan was eventually refinanced in April 2012 by a group of banks led by BankUnited, which provided a credit facility of up to $60 million. Doc. No. 8, Ex. 1.  About $40 million was advanced initially, to pay off the $37.5 million Wells Fargo loan and pay $2.9 million to Dr. Desai. *Id.*, Ex. 2 at 22. Only eight months later, BankUnited sent Universal notices of default, asserting that the 2012 loan had been procured through false financial information. *Id.* On February 1, 2013, BankUnited notified Universal of its intent to accelerate repayment of the loan and sell the pledged shares of the subsidiaries' stock. *Id.*

BankUnited's UCC Article 9 sale was scheduled for February 19, 2013. *Id.* On February 4, 2013, the Florida Department of Financial Services ("DFS") initiated enforcement proceedings against Universal's subsidiaries. *Id.* Universal filed for relief under Chapter 11 on February 6, 2013, less than two years after the Stock Redemption. *Id.* Dr. Desai remained in charge of Universal until the Trustee was appointed on April 22, 2013 (Doc. No. 1 at ¶ 13).

[8]  Fed. R. Bankr. P. 7012(b) and Fed. R. Civ. P. 12(b).

[9]  *Thaeter v. Palm Beach County Sheriff's Office*, 449 F.3d 1342, 1352 (11th Cir. 2006) (citation omitted); see *also* Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.").  "A contract attached as an exhibit to a pleading may be considered part of that pleading." *Bulford v. Verizon Bus. Network Servs., Inc.*, 564 Fed. Appx. 449, 450 (11th Cir. 2014). Further, "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account." *Watson v. Bally Mfg. Corp.*, 844 F. Supp. 1533, 1535 n.1 (S.D. Fla. 1993), aff'd, 84 F.3d 438 (11th Cir. 1996) (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357, at 299 (1990)).

[10]  556 U.S. 662 (2009).

[11]  *Id.* at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"[12]  While a court must accept a plaintiff's factual allegations as true, a court is not constrained to accept incorrect legal theories.  A complaint may be dismissed if the claims fail as a matter of law.[13]

II.    Equity IX's Motion to Dismiss

A.  Fraudulent Transfer Claims

In Counts I, III, and V of the Complaint, the Trustee seeks to avoid the Stock Redemption as a fraudulent transfer and recover from Equity IX up to $32.3 million of the redemption price.[14] In Count I of the Complaint, the Trustee alleges a constructive fraudulent transfer claim under § 548(a)(1)(B) of the Bankruptcy Code and seeks avoidance of the transfer under § 550 of the Code.[15]  In Counts III and V of the Complaint, the Trustee alleges a fraudulent transfer claim

---

[12] *Iqbal*, 556 U.S. at 678 (internal citations omitted).

[13] *Id.* at 667-78.

[14] Doc. No. 1 at 23-31.

[15] Count I of the Complaint is based on § 548(a)(1)(B) of the Bankruptcy Code.  That section provides:
(a)(1) The trustee may avoid any transfer … of an interest of the debtor in property, or any obligation … incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
...
(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

under § 726.105(1)(b) and  § 726.106(1) of the Florida Statutes, respectively, and seeks to avoid the transfer under §§ 544 and 550 of the Bankruptcy Code.[16]  The Trustee's claim is essentially, that Equity IX received payment to which it was not entitled because Universal was then insolvent and received less than reasonably equivalent value for the transfer. [17]

Equity IX argues that Counts I, III, and V of the Trustee's Complaint should be dismissed for failure to state a claim, because Universal could not have been insolvent at the time of the redemption, and was not rendered insolvent as a result of the redemption, because the banks decided to loan Universal $37.5 million, meaning that Universal must have been credit-worthy in an amount nearly $5 million greater than the redemption payment.[18]  Equity IX also points to the 2012 credit facility of up to $60 million dollars.[19]  According to Equity IX, these two groups of lenders would not have made these loans if Universal's net value had been less than $33 million in 2011 or thereafter.  Equity IX also contends that Universal could not have received less than

---

[16]  Count III of the Complaint is based on § 726.105(1)(b) of the Florida Statutes.  That section provides:

(1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

...

(b)  Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
1. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
2. Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

Count V of the Complaint is based on § 726.106(1) of the Florida Statutes. That section provides:
(1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

[17]  The Trustee's state law fraudulent transfer claims, asserted through § 544(b) of the Bankruptcy Code, are analogous "in form and substance" to their bankruptcy counterparts.  *Kapila v.  SunTrust Mortgage, Inc. (In re Pearlman)*, 515 B.R. 887, 894 (Bankr. M.D. Fla. 2014).  To prevail under the constructive fraud theory, under bankruptcy fraudulent transfer statute or under Florida law, the Trustee must prove by a preponderance of evidence that the debtor was (1) "insolvent at the time the transfer was made" and (2) "received less than reasonably equivalent value in exchange for the transfer." *Id*.

[18]  Doc. No. 9 at 10 (citing Doc. No. 1 at ¶ 61).

[19]  *Id.*

reasonably equivalent value because the agreed price was made through arms-length negotiations.

1. Insolvency

Insolvency for fraudulent transfer purposes is a question of fact which requires "fair valuation."[20]  The Trustee's Complaint states a plausible claim against Equity IX for receiving a fraudulent transfer under § 548(a)(1)(B) of the Bankruptcy Code, and under §§ 726.105(1)(b), 726.106(1), Florida Statutes.  The Complaint adequately describes the financial deterioration of Universal between August 2006 and February 2011.  The Complaint alleges that Equity IX, through Warburg and Sanghvi, knew of this from their internal analyses, which estimated Universal's equity value at only $23.9 million in 2009 and, later, at only $5 million (¶¶ 46 and 50).  The Complaint alleges negative trending in such valuation factors as EBITDA, net income, cash, revenue, and the rising costs of medical claims from which Universal never recovered (¶¶ 51-54).  The Complaint also plausibly alleges that Universal's capital structure was impaired by the $37.5 million loan secured by liens on all of its assets.

The Trustee alleges material errors in Universal's financial projections and that Universal's impaired financial condition was concealed by improper and flawed accounting methods and by the failure to employ safeguards and controls (¶¶ 55-57).  Therefore, the audited financial statements cited by Equity IX may not overcome evidence that the business valuation is marked by the $33.4 million stock redemption.[21]

---

[20]  11 U.S.C. §101(32); Fla. Stat. § 726.103(1); *Lawson v. Ford Motor Co. (In re Roblin Indus.),* 78 F.3d 30, 35-36 (2d Cir. 1995); *VFB LLC v. Campbell Soup Co.,* 482 F.3d 624, 633 (3d Cir. 2007).

[21]  *Lawson v. Ford Motor Co. (In re Roblin Indus.),* 78 F.3d 30, 35-36 (2d Cir. 1995); *VFB LLC v. Campbell Soup Co.,* 482 F.3d 624, 628-29 (3d Cir. 2007); *see In re Duque Rodriguez,* 75 B.R. 829, 832 (Bankr. S.D. Fla. 1987); *see also, Official Comm. of Unsecured Creditors of Tousa, Inc. v. Citicorp N. Am., Inc. (In re Tousa, Inc.),* 422 B.R. 783, 859 (Bankr. S.D. Fla. 2009).

The Complaint adequately alleges that Universal was worth no more, and perhaps even less, than the Stock Redemption price; and that, Universal was required to borrow an even greater amount, secured by liens on all assets, to pay that price (¶ 74).  The additional secured debt, therefore, frames the issue that Universal was rendered insolvent by the entire transaction. The relevance of the lenders' credit underwriting is a disputed factual issue.  It is certainly plausible, as the Trustee argues, that the lenders were misled by inaccurate financial projections and audits, and that Universal's actual enterprise value was much less.

      2.    <u>Reasonably Equivalent Value</u>

The applicable statutes do not define "reasonably equivalent value."  In deciding that issue, however, courts generally consider such factors as the "good faith of the parties, the disparity between the fair value of the property and what the debtor actually received, and whether the transaction was at arm's length."[22]

It may be that the majority shareholder (Dr. Desai) satisfied his own agenda in these negotiations:  to eliminate the veto power of the Preferred Stock and avoid a later public confrontation in August 2011 if Universal was unable to pay the mandatory redemption price. But, even if the Stock Redemption price was negotiated by parties having adverse interests, as Equity IX alleges, that does not mean that Universal received reasonably equivalent value.  The Trustee relies on a long-recognized legal theory that a company receives no net increase in value when it redeems its outstanding stock.[23]

---

[22] *In re Dealers Agency Services, Inc.,* 380 B.R. 608, 619 (Bankr. M.D. Fla. 2007) (quoting *In re Vilsack,* 356 B.R. 546, 553 (Bankr. S.D. Fla. 2006).

[23] *Robinson v Wangemann,* 75 F.2d 756 (5th Cir. 1935).  This Fifth Circuit case is applicable in the Eleventh Circuit.  *Bonner v. Prichard,* 661 F.2d 1206, 1207 (11th Cir. 1981).

Equity IX argues that Universal realized the benefit of saving approximately $28 million

from the mandatory price of about $60 million.  Such an argument ignores, however, the legal

prohibition against a stock redemption if a company is, or would be rendered, insolvent.[24]  Thus,

factual issues remain to be resolved before deciding the applicable legal principle.

A.    "Unfair Transaction" Claim

Even though Equity IX held a minority interest, it had substantial leverage through its

veto power to block certain corporate transactions (¶ 25).  Equity IX asserts Sanghvi owed no

fiduciary duties to Universal because he was acting as the agent of a minority shareholder of

Universal.[25]  The Trustee alleges facts in the Complaint, however, that when taken as true may

establish that no major decision could be made by Universal without Equity IX's approval (¶¶ 20, 25,

Ex. A, Section 1.(f).).  Equity IX also held Preferred Stock giving it greater rights than the

common stock, the most important of which was the prior claim to all of Universal's equity (¶¶

26, 28).

Where a director is on both sides, a transaction may have to be "entirely fair," meaning

that there must be fair dealing and a fair price.[26]  Delaware law may allow the setting aside, or

---

[24] *See* 8 Del. C. § 160(a)(1); *see also SV Inv. P'rs, LLC v. ThoughtWorks, Inc.*, 7 A.3d 973, 985 (Del. Ch. 2010) *aff'd*, 37 A.3d 205 (Del. 2011) ("Most significantly… the common law has long restricted a corporation from redeeming its shares when the corporation is insolvent or would be rendered insolvent by the redemption.").

[25] "Under Delaware law, fiduciary duties are owed only by directors, officers or controlling shareholders." *In re Hechinger Inv. Co. of Del.*, 274 B.R. 71, 93 (D. Del. 2002).

[26] Delaware law includes cases setting aside, or assessing damages for, self-interested or conflicted transactions not "entirely fair" to corporations and/or shareholders. *See Weinberger v. UOP*, 457 A.2d 701 (Del. 1983) (cash-out merger not entirely fair where, among other things, the acquiring entity's designated directors on the target's board withheld a feasibility study from the other board members); *Mills Acquisition Co. v. MacMillan, Inc.*, 559 A.2d 1261 (Del. 1989) (corporation's proposed asset option/lockup agreement with bidder was enjoined as not entirely fair where certain of corporation's board of directors tipped off the bidder regarding content of rival bidder's bid); *Boyer v. Wilmington Materials, Inc.*, 754 A.2d 881 (Del. Ch. 1999) (plaintiff stockholder awarded damages where the sale of corporate assets was not entirely fair because defendants, although complying with corporate bylaws and state law, actively sought to keep plaintiff uninformed about their plans in order to deprive him of the opportunity to protect his interests before the transaction was approved).

14

assessing damages for, transactions that are not "entirely fair" to corporations and its shareholders.[27]  It is undisputed that no valuation or fairness opinion was obtained before the stock redemption to ensure the transaction was fair to Universal according to Delaware law (¶ 76).

     *Weinberger v. UOP*, 457 A.2d 701 (Del. 1983), cited by the Trustee, is instructive as to a director's duty of loyalty.  The Signal Companies ("Signal"), the majority shareholder of UOP, acquired the remaining shares of UOP by a merger transaction which included a cash payment to all of the minority shareholders.  The Signal designees on UOP's board did not disclose to the other directors a feasibility study indicating that the price of the stock should be as much as $3 per share higher than what Signal was offering.  The Delaware Supreme Court held that the transaction was not fair because Signal's designated directors failed to disclose the feasibility study and its findings.[28]  The preparation of, and failure to disclose, the feasibility report "cannot but undermine a conclusion that this merger meets any reasonable test of fairness.  The outside UOP directors lacked one material piece of information  generated by two of their colleagues, but shared only with Signal."[29]  Additionally, the court held there is no safe harbor for divided loyalties of directors.[30]  Individuals who act as directors of two corporations must do

---

[27]  *See Weinberger*, 457 A.2d 701; *Mills Acquisition Co.*, 559 A.2d 1261; *Boyer*, 754 A.2d 881; *Bomarko, Inc. v. International Telecharge, Inc.*, 794 A.2d 1161 (Del. Ch. 1999); *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213 (Del. 2012).

[28]  *Weinberger*, 457 A.2d at 711-12.

[29]  *Id.* at 712.

[30]  *Id.* at 710.

what is best for both corporations.[31]   The breadth of the opinion suggests that it should not be limited to "squeeze out" mergers by a majority shareholder, as defendants suggest.[32]

The Trustee alleges that Sanghvi withheld the Warburg analyses and valuations while negotiating the Stock Redemption (¶¶ 49, 65, 141).  The facts in *Weinberger* differ somewhat from those in this proceeding; but, if Universal was insolvent, or would be made insolvent, by the transaction, then Sanghvi's withholding the data − to induce the other directors' approval − would make the Stock Redemption inherently unfair.[33]

Conclusion

Equity IX's objections to the Complaint amount to factual disputes and legal issues that are more appropriately resolved after the answer is filed and discovery completed.  Equity IX has not demonstrated that the Trustee has failed to state plausible and viable claims.  Therefore, the motion to dismiss will be denied.

Wise's Motion to Dismiss

In Counts II, IV and VI, the Trustee seeks to avoid the stock redemption as a fraudulent transfer and recover from Wise the stock redemption price.  In Count II of the Complaint, the Trustee alleges a constructive fraudulent transfer claim under § 548(a)(1)(B) of the Code, and

---

[31]   In *Weinberger*, the court went on to say that "[w]hen directors of a Delaware corporation are on both sides of a transaction, they are required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain.  The requirement of fairness is unflinching in its demand that where one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts."  *Weinberger*, 457 A.2d at 710-11.

[32]   *See In re EZCorp Inc. Consulting Agreement Derivative Litigation*, 2016 WL 301245, at *12 (Del. Ch. Jan. 25, 2016) (stating Delaware law has applied the 'entire fairness' test more broadly, and that "Delaware courts have expressly rejected the contention that the entire fairness framework only applies to squeeze-out mergers.").  *In re EZCorp* goes on to list a number of cases where Delaware courts applied the entire fairness framework outside of the squeeze-out merger context.  *Id.* at *12-15.

[33]   Doc. No. 23 at 13.

seeks avoidance of the transfer under § 550 of the Code.[34]  In Counts IV and VI of the

Complaint, the Trustee alleges a fraudulent transfer claim under § 726.105(1)(b) and  §

726.106(1), Fla. Stat., respectively, and seeks to avoid the transfer under §§ 544 and 550 of the

Code.[35]  Essentially, the Trustee claims that the redemption of Wise's Preferred Stock was an

integral part of the entire Stock Redemption which was closed when Universal was insolvent and

Universal received less than reasonably equivalent value from the transfer.

Defendant Wise argues that Counts II, IV, VI, and VII of the Complaint should be

dismissed, making substantially the same arguments regarding insolvency and valuation as

Equity IX.  Wise also makes the point that his redemption should be viewed separately from that

of Equity IX; the impact on Universal of redeeming his stock for only $1.1 million could not

have made Universal insolvent.[36]

For the reasons stated above, the Court finds that none of the arguments advanced by

Wise demonstrate the Trustee's failure to state a claim that Wise received a fraudulent transfer.

The Trustee has adequately and plausibly alleged that redemption of Wise's Preferred Stock was

an integral part of a single transaction, negotiated by Sanghvi, for the mutual benefit of Equity

IX and Wise.  The Trustee has also plausibly alleged that the redemption of Wise's Preferred

Stock was an "unfair transaction."  Wise's objections to the Complaint amount to factual and

legal disputes more appropriately resolved after the issues have been framed and discovery

taken.  Therefore, the motion to dismiss will be denied.

---

[34] *See* Note 15, *supra.*

[35] *See* Note 16, *supra.*

[36] Doc. No. 8 at 9.

IV.    The Sanghvi and Warburg Motion to Dismiss

The Trustee has brought claims against Sanghvi and Warburg for breach of fiduciary duty (Counts VIII and IX).  The Trustee claims that Sanghvi owed fiduciary duties of good faith, care and loyalty to Universal and to the creditors of Universal, and that Sanghvi breached these duties when he withheld knowledge of Warburg's diminished valuations of Universal.  In Count IX, the Trustee claims that Warburg is liable, under the doctrine of *respondeat superior*, for Sanghvi's breaches of duty.

Many of the arguments regarding Sanghvi's duties to Universal have been dealt with above.  Defendants Sanghvi and Warburg contend that the Trustee's single claim against Sanghvi fails because Section 4.5 of the Stock Redemption Agreement included a general release (the "Release").[37]  In turn, they argue that Warburg is protected from any claim for vicarious liability because its employee was released.[38]

Exculpation by reason of a release is ordinarily an affirmative defense to a claim for relief.[39]  But, such a defense may be raised in a motion to dismiss "where the complaint affirmatively shows that the claim is barred."[40]  The burden is on defendants to show the Trustee's claims are barred by the Release.[41]

---

[37] Doc. No. 1, Ex. C.

[38] Doc. No. 10 at 8-9 (citing *Doe v. St. John's Episcopal Parish Day School, Inc.*, 997 F. Supp. 2d 1279, 1287 (M.D. Fla. 2014); *Mukamal v. Bakes*, 378 Fed. Appx. 890, 899 (11th Cir. 2010)).

[39] Fed. R. Civ. P. 8(c).

[40] *J.M. Blythe Motor Lines Corp. v. Blalock*, 310 F.2d 77, 77 (5th Cir. 1962) (the manner  by which a defense is asserted is a matter of procedure governed by federal principles; defense of  statute of limitations must be affirmatively established by complaint); *Skye v. Maersk Line, Ltd. Corp.*, 2011 U.S. Dist. LEXIS 110917 (S.D.  Fla. Sept. 28, 2011)  (same).

[41] *TMTV, Corp. v. Mass. Prods.*, 645 F.3d 464, 472 (1st Cir. 2011); *see also Fuller v. Johannessen (In re Johannessen)*,  76 F.3d 347, 350 (11th Cir. 1996) (determination of whether a settlement agreement discharged a claim for fraud could not be decided in a motion to dismiss).

Here, the Release is a limited one, covering any and all claims and causes of actions that arose "prior to the closing."  Defendants argue that the Trustee's claim against Sanghvi is based on his actions prior to closing, and, thus, covered by the Release.[42]

The Trustee alleges, however, that Sanghvi's inaction or omissions continued to occur through the closing, when he still had the opportunity to make the valuation disclosure.[43] Further, the Complaint states plausible claims to invalidate the entire transaction, including the Release (¶¶ 135-143).  If the Trustee can succeed in proving the necessary elements to avoid the Stock Redemption, the Release would be nullified.[44]

Under Delaware law, fiduciary duties are owed only by directors, officers or controlling shareholders."[45]  Sanghvi is alleged to have had more leverage than the director of a minority shareholder; under the 2006 Stockholder Agreement, no major decision could be made by the Universal's board without approval by Equity IX's designated director, Sanghvi.

Article VI (f) of the COI is modeled on and tracks the language of 8 Del. C.

---

[42]  Doc. No. 10 at 8.

[43]  Doc. No. 24 at 4-5.  *See Future Fibre Techs. Pty. Ltd. v. Optellios, Inc.*, 2011, U.S. Dist. LEXIS 90548 (D. Del. Aug. 15, 2011) (release that covered "any act or omission occurring prior to or on the date of [the release]" did not cover a patent infringement claim based on actions occurring prior to the agreement, but which could not have arisen until afterward because the patent was not yet in existence).

[44]  An action for fraud is not itself included in the Release.  *E.I. Du Pont de Nemours & Co. v. Florida Evergreen Foliage*, 744 A.2d 457, 461 (Del. 1999) ("At a minimum, if one party is to be held to release a claim for fraud in the execution of the release itself, the release should include a specific statement of exculpatory language referencing the fraud.").

Under both Florida and Delaware law, the release of one party does not operate as a discharge of all.  Doc. No. 24 at 8.  *Sun First Nat'l Bank v. Batchelor*, 321 So. 2d 73 (Fla. 1975); *Blackshear v. Clark*, 391 A.2d 747 (Del. 1975); *ING Bank, FSB v. Am. Reporting Co., LLC*, 859 F. Supp. 2d 700, 704-05 (D. Del. 2012).  Pursuant to section 768.041(1), Fla. Stat., a "release or covenant not to sue as to one tortfeasor for property damage to, personal injury of, or the wrongful death of any person shall not operate to release or discharge the liability of any other tortfeasor who may be liable for the same tort or death."  Fla. Stat. § 768.041(1).  Delaware law likewise abrogates the common law rule as to the release of joint tortfeasors.  *Blackshear v. Clark*, 391 A.2d 747; *ING Bank*, 859 F. Supp. 2d at 704-05.

[45]  Doc. No. 24 at 10 (quoting *Hechinger*, 274 B.R. at 93).

§ 102(b)(7) ("Section 102(b)(7)").  Subject to four exceptions, Section 102(b)(7) exculpates "directors from monetary liability for a breach of the duty of care, but not for conduct that is not in good faith or a breach of the duty of loyalty."   The Trustee argues that the first exception for breach of duty of loyalty is applicable in this case because, Sanghvi, as a director, owed Universal an uncompromising duty of loyalty.  As a result, Sanghvi's non-disclosure of material information constituted an act or omission that was not in good faith.  As to the third exception, the Complaint alleges Universal was insolvent at the time of, or became insolvent because of, the Stock Redemption (¶¶ 72-74).  Under 8 Del. C. § 160, it would have been unlawful for Universal to redeem the Preferred Stock if it was insolvent or would become so by the redemption.[46]  Sanghvi asserts that he relied in good faith on the financial statements and projections of Universal; but, the Complaint alleges that Sanghvi (with the assistance of his employer Warburg) knew better.  They had prepared their own valuation analyses of Universal's financial condition (e.g. the 2009 FQ Valuation) (¶ 50).  The final exception to Section 102(b)(7) is for any transaction in which the director derived an improper personal benefit.  The facts of the Complaint allege that, largely due to his negotiation of the Stock Redemption, Sanghvi received a special bonus from Warburg within days after the closing of the Stock Redemption (¶ 69).

Taking the allegations of the Complaint as true:  (1) Sanghvi had a duty to disclose the FQ 2009 Valuation; (2) Sanghvi concealed this valuation during his negotiations with Mr. Patel; (3) the information withheld was material to the Universal Board's approval of borrowing $37.5 million of senior secured debt; (4) Universal was rendered insolvent thereby; and (5) Sanghvi was directed in these actions by Warburg.  The Court finds that the Trustee's Complaint alleges

---

[46] *See* 8 Del. C. § 160(a).

facts which, if proven, state a claim against Sanghvi for breach of fiduciary duty and against Warburg for directing Sanghvi's conduct. Their joint motion to dismiss will be denied.

CONCLUSION

Taking the facts set forth in the Complaint as true, the Court concludes that the Trustee has stated plausible claims against defendants Equity IX and Wise for receiving a fraudulent transfer and for receiving the benefits of an inherently unfair transaction. The Complaint also states plausible claims against Sanghvi and Warburg for breaches of fiduciary duty to Universal. The Court further concludes that the defendants' objections to the Complaint amount to factual and legal disputes more appropriately resolved after the issues have been framed and discovery taken. Therefore, the defendants' motions to dismiss will be denied. Accordingly, it is hereby

ORDERED:

1. All defendants' Motions to Dismiss are DENIED.

2. Defendants will have 21 days from the entry of this order to file an answer to the Complaint.

Clerk's office to serve.